COOKENDERFER (MANDEVILLE v.). See Cases Nos. 9,009 and 9,010.

COOKENDORFER (UNITED STATES v.). See Case No. 14,856.

COOKER, The JOHN. See Case No. 7,337.

## Case No. 3,182.

### COOKINGHAM v. FERGUSON et al.

[8 Blatchf. 488;[1] 4 N. B. R. 635.]

Circuit Court, N. D. New York. June 20, 1871.

SUIT BY ASSIGNEE IN BANKRUPTCY TO SET ASIDE CONVEYANCE — PARTIES—LIMITATIONS — INTENT TO DEFRAUD.

1. Whether an assignee in bankruptcy can, in a suit in equity against the bankrupt and an

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

alleged fraudulent grantee of his, of real estate, set aside the grant, as void, without making parties to the suit persons to whom such grantee executed mortgages on the premises subsequently to the making of the grant, quere.

2. Whether an assignee in bankruptcy can assail a conveyance, as fraudulent against creditors, made by the bankrupt two years before the petition in bankruptcy was filed, quere.

3. Whether the limitations as to time, prescribed in the 35th and 39th sections of the bankruptcy act of March 2, 1867 (14 Stat. 534, 536), apply to all conveyances which the bankrupt himself could not impeach as fraudulent as against creditors, quere.

4. An intent on the part of a debtor to prefer his individual creditors over persons who might charge him with a statutory liability for the debts of a corporation of which he is a stockholder, is not an intent to defraud creditors.

5. A transfer of real estate was made by A. to his son, in March, 1866. In January, 1868, A. was adjudged a bankrupt. The assignee in bankruptcy brought this suit against A. and his son, to set aside the transfer, as fraudulent, as against the creditors of A., on the ground that the transfer was a sham sale, that the price was inadequate, and that A. continued to use and possess the property, after the sale. On the facts of the case, the bill was dismissed, with costs.

[In equity. Suit by Henry J. Cookingham, assignee in bankruptcy of Amos S. Ferguson, against Amos S. Ferguson and Charles A. Ferguson to set aside a conveyance as fraudulent.]

William Kernan, Jr., for plaintiff.
E. J. Richardson, for defendants.

WOODRUFF, Circuit Judge. In its chief characteristics this case is most extraordinary. On the 26th of March, 1866, Amos S. Ferguson was the owner of a farm of thirty-nine acres, in the town of Frankfort, and of sundry articles of personal property, including household furniture, and, also, of forty acres of land in a western state. He was sick and insolvent. His chief and almost sole individual creditors were his brother-in-law, John W. Bridenbacker, and his brother, James D. Ferguson, who, besides some claims in their own favor against him, were endorsers of his note at bank for $6,900, or thereabouts. He was pursued by another party, who alleged that he was a member of a towing company, and, as a stockholder therein, was liable for their debts, by virtue of the statutes of the state. This membership and liability Amos S. Ferguson appears to have denied, and an action was then pending by which it was sought to charge him. The debts of the towing company were very large, amounting, in all, to upwards of sixty thousand dollars.

In this situation, and in a state of health in which he had been advised that he was liable at any moment to sudden death, from what one of his physicians deemed disease of the heart, he sent for his said brother and brother-in-law to come to his house, for a

consultation regarding his affairs. He declared his wish and intention to apply his property to the payment of his debts. The proof may be taken to show that he declared his purpose to apply it to the payment of his individual debts, and especially to the protection of them, his principal individual creditors and endorsers, to the exclusion of alleged liability for the debts of the towing company, for one only of which he had then been, or was ever afterwards, prosecuted. He proposed to his brother-in-law, Bridenbacker, to purchase his farm, and he declined. He had a son, then twenty-four years of age, who, though residing with his parents, had been, for several years, doing business on his own account, buying and selling cattle, speculating in grain, and raising and selling tobacco, and therein had made some money, his property then being worth, according to his own statement, which is not disproved, fifteen hundred dollars. As a result of the consultation, it is proposed to sell the farm to this young man. To this Bridenbacker and James D. Ferguson not only make no objection, but, I think, the preponderance of the evidence is, that Bridenbacker himself proposed it. The value of the farm is discussed, and seven thousand dollars is agreed upon, both Bridenbacker and James D. Ferguson declaring that seven thousand dollars is an outside price or estimate. The son, Charles, consents to purchase, provided he can be allowed time within which to make the payments; and he is assured by his uncle Bridenbacker, and in the presence, if not with the express assent, of his uncle James, that he shall have all the time necessary, and that they will take care of the note held by the bank, which they had endorsed. There was already a mortgage upon the farm of three thousand dollars, and the balance, four thousand dollars, it was agreed should be appropriated to their security or indemnity against their indorsement. An inventory of the farming utensils, and two horses, wagons, harness, sleighs, an interest in two canal boats, and some household furniture, not exempt from execution, is made by Bridenbacker, and, on consultation, and after careful inquiry into the actual cost of the articles of furniture, an appraisal is made and set down by him, amounting in all to two thousand and eighty-four dollars, against which is set down the sum of four hundred dollars, (which, it was agreed between the father and son, on an examination of their accounts, was then due to the young man), and one thousand six hundred and eighty-four dollars is fixed as the sum or balance to be paid therefor. Counsel is sent for, a deed is prepared and executed, a bill of sale of the personal property is drawn. and bonds and mortgages for the four thousand dollars, payable in sums of one thousand dollars each, at one, two, three, and four years, with intent that the latter should be assigned to Bridenbacker, or to him and James D. Ferguson, for their indemnity. On further consultation, in view of the giving, by the young man, of his note for one thousand six hundred and eighty-four dollars, payable in one year, with interest, Bridenbacker agrees to receive for the four thousand dollars, four notes, each for one thousand dollars, payable at two, three, four, and five years, with interest from date, reiterating his assurance that Charles, the son and nephew, shall have time within which to make the payments; and the notes are made and delivered to Bridenbacker, with the promise of Charles to give him a mortgage on the farm, if he requests it, and Bridenbacker carries the notes away. All this appears to have been quite satisfactory. Charles, the son, takes charge of the farm, and improves it, by planting a hop yard of three acres, and by some ditching, and makes sale of portions of the personal property. His father sells his western land, and, by some trade, makes a further small profit, and, by the contribution of Charles thereto of some seven hundred and fifty dollars or nine hundred dollars, a payment of one thousand five hundred dollars is made on the bank note, in relief of Bridenbacker and James D. Ferguson to that extent. Charles pays other debts of his father, until, by his payments on his father's account, the note for one thousand six hundred and eighty-four dollars is satisfied. Meantime, the eldest daughter employs herself in teaching music, in which she has before had experience, and earns thereby sufficient for her own clothing and expenses, lodging at home, and contributing small amounts to the support of the family. A younger brother goes to Utica, finds employment, and supports himself. The mother keeps the house, as theretofore, and the invalid father and the remaining child, a young daughter, reside with Charles, making up the family.

After a time, and in or about June, 1867, Bridenbacker desiring security for the $4,000, Charles executes and delivers to him a mortgage on the farm, to secure their payment. In August, 1868, the first mortgage upon the farm, which, on the purchase, Charles had assumed to pay, is called in, and Charles negotiates a loan of $3,000, gives his own obligation, secured by mortgage on the farm and by other collaterals, and takes up the first mortgage, thus making his mortgage to Bridenbacker a first mortgage upon the farm. In all this, everything appears to have been done beneficially to Bridenbacker and James D. Ferguson, agreeably to their wishes and assent, and to their entire satisfaction. True, it is testified that James D. Ferguson stated, at the time, that the price to be paid would not be sufficient to pay and protect him and Bridenbacker to the full extent of their liabilities, but he did not then suggest or intimate that the price Charles agreed to pay

was not the full value of the property. But, in January, 1868, their brother, Amos S. Ferguson, had made application to the district court, and was adjudged thereupon a bankrupt; and, at some time thereafter, Bridenbacker and James D. began to manifest unfriendliness, in view of the losses they were likely to sustain, and to threaten Charles, that, if he did not pay his father's indebtedness to them, they would break up the sale made to him. Their testimony in this suit indicates the ground upon which they intended to assail it, namely, that the sale was a sheer fraud, a cover of their brother Amos' property, made to cheat his creditors, and accompanied by an assurance by both Amos and Charles that they should be paid or protected, notwithstanding the sale and conveyance. I do not, as will be presently stated, think such fraud is established, but, taking the claim as made, the practical result is, that these uncles, having aided by their counsels in seducing the young man into the transaction, having thereby secured to themselves his personal obligations to the amount of four thousand dollars, secured amply by a first mortgage on the farm, having led him to make payments to an amount in all more than he was worth when he made the purchase, of which they have largely shared the benefit, to employ his time and industry upon the premises, to some extent improving the same, and to involve himself in further personal responsibility for the three thousand dollars with which he paid off the prior mortgage and made their four thousand dollars unquestionably secure, after nearly three years have elapsed, threaten, with all the fruits of the transaction still in their possession and enjoyment, to set up this charge of fraud, conceived and carried into execution as the result of their consultation and co-operation, in the hope of reaping, from the setting aside of the fraudulent sale, an additional benefit; and the principal allegations of fact urged in corroboration of this story are, first, that the price agreed upon, with their approval, at the time of the sale, $7,000, was inadequate, and, second, that Charles, the son, did not, on receiving his deed, turn his invalid father, his mother, and his helpless little sister into the highway, to shift for themselves.

It can hardly be necessary to say, that if they, John W. Bridenbacker and James D. Ferguson, had, as creditors, come into a court of equity, to set up their claim, under circumstances such as these, the court would receive them with small favor. Of that they were, no doubt, fully conscious, and they have sought an ingenious, though indirect, mode of accomplishing the result, through the assignee in bankruptcy of the estate of their brother Amos, who is, in form and in law, trustee for all of his creditors. In fact, they are the only persons who have proved debts against that estate, and they will, if no other creditors appear, enjoy all the benefit of any recovery by the assignee. They seek the assignee, they assume the burthen of the litigation, they give him their obligation for his indemnity against costs, and this suit is the result, and they are their own anxious, willing witnesses, and vigilant, active promoters of the prosecution, devoting, further, their time and industry to the procurement of evidence; and, though it is not specifically proved, there is ground for inferring, that counsel are employed by them, to set aside the transaction, have the sale and conveyance declared void, compel the defendant Charles to give up the farm, and account for and pay over all the property and the proceeds of sales, and that, without allowance for what he has paid, or protection against the obligations which he has assumed.

It is insisted by the counsel for the plaintiff, the assignee in bankruptcy, that the circumstances above alluded to, however clear it may be that Bridenbacker and James D. Ferguson were, upon their own evidence, parties to the transaction, do not bar him, as assignee for the benefit of all creditors who either have or may hereafter prove their debts; and that the misconduct, or even fraud, of some of the creditors of a bankrupt, is no hindrance to his proceeding to recover all that, in law or in equity, he, as assignee, is entitled to recover, as part of the estate in which creditors are entitled to share. There is no occasion here to controvert or deny that proposition. It is sufficient to say, that the relation which Bridenbacker and James D. Ferguson bear to the transactions in question, and their conduct herein, impairs confidence in their testimony, and it is chiefly upon that testimony, contradicted in all important particulars, that the claim that there was an actual intent to defraud creditors, rests; and, in view of that conduct, and of the very large contradiction by numerous witnesses who testify on the subject of inadequacy of price, it is not unreasonable to say, that the testimony of these witnesses falls under liability to large qualification, in the estimate the court should place upon its weight in this controversy.

It is in this view that I have deemed it relevant to consider the history of the transaction, the share the chief witnesses and sole creditors who have proved their debts have had therein, and their actual relation to the litigation itself, carried on at their cost and risk, and for their benefit, while they are themselves in the possession and enjoyment of the fruits of what they, after nearly three years of acquiescence and enjoyment, claim to have been a fraud. I am aware that, in the narrative I have given, I have not alluded, in detail, to the evidence, nor noticed many particulars relied upon by

the plaintiff's counsel. But they have not escaped my attention, and I have contented myself with giving the results of a consideration of all the testimony and of the degree of credit to which I deem it entitled.

Subject to these observations, I must dispose of the case as it is, in form and legal effect—an endeavor by an assignee in bankruptcy to set aside a conveyance of property made by the bankrupt, declare it void, and compel a delivery of the property and the proceeds of all that has been sold, to the plaintiff. Viewing the case solely in that aspect, my conclusions may be briefly stated.

1st. It was not suggested on the argument, but it is by no means clear, that the decree prayed for could be granted in a suit to which the holders of mortgages upon the farm, made by the defendant Charles A. Ferguson, subsequently to the conveyance to him, are not parties. Surely, the mortgage to Bridenbacker, upon the proofs in the case, must, if the sale were declared fraudulent and void, fall with the conveyance. It was taken with full knowledge of all the facts, if any there be, which invalidate the sale; and, as to the other mortgage, it is difficult to see how the presence of the holder can be dispensed with, when the foundation of his title is attacked and sought to be wholly defeated. The bill does not recognize its existence, nor does it seek to recover the equity of redemption, leaving that mortgage a subsisting lien. Observations pertinent to this subject, and to the duty of the court to take the objection, though not raised by the defendants, may be found in the decision of this court in Florence Sewing Mach. Co. v. Singer Manuf'g Co. [Case No. 4,884], and in cases there referred to; Mallow v. Hinde, 12 Wheat. [25 U. S.] 193; Elmendorf v. Taylor, 10 Wheat. [23 U. S.] 152; Coiron v. Millaudon, 19 How. [60 U. S.] 113, 115; Shields v. Barrow, 17 How. [58 U. S.] 130; Greene v. Sisson [Case No. 5,768]; and other cases. It is, however, unnecessary to consider this point, or, in this case, to express an opinion upon it.

2d. It is unnecessary, in the view I take of the proofs, to inquire whether the assignee in bankruptcy can assail a conveyance made by the bankrupt two years or thereabouts before the petition whereon he was adjudged bankrupt was filed, or whether the limitations prescribed in the thirty-fifth and thirty-ninth sections of the bankrupt law, apply to all conveyances which the bankrupt himself could not impeach as fraudulent against creditors. I am, however, not willing to give any assent to the argument, that the assignee is, in such sense, the representative of the bankrupt, that he cannot attack and set aside a conveyance on the mere ground that the bankrupt himself is bound by it. If, in another case, it should be material, that question will receive the consideration it deserves.

3d. The transaction between the defendants is assailed upon the ground of fraud, and three sources of evidence of fraud are relied upon by the plaintiff, namely: (1) Testimony claimed to warrant the inference of actually expressed intent, at the time of the conveyance, to cover the property, by a sham sale, to be held by the defendant Charles in form, but in fact for the benefit of his father, in order that the same might be kept from his creditors; (2) Testimony claimed to corroborate the other, by showing that the price was greatly inadequate; and, finally, (3) Testimony claimed to show continued use and possession of the property by the bankrupt, after the sale.

(1) Some reasons for deeming the proof to fail in establishing an expressed intention to defraud creditors may be inferred from the narrative I have above given. But, even taking the testimony of Bridenbacker and James D. Ferguson, the plaintiff's chief witnesses to this precise point, it fails to establish it; and, for reasons already suggested, I should deem it overborne by the testimony in behalf of the defendants, if it were more specific. All that can justly be claimed, on this portion of the proofs, is, that Amos S. Ferguson intended to give a preference to his individual creditors, and especially to Bridenbacker and his brother James, over persons who might charge him with liability for the debts of the towing company, and that the sale to Charles was made for that purpose, and with intent to appropriate all the property of the bankrupt to such individual debts. If this transaction had taken place within four months of the filing of the petition upon which Amos S. Ferguson was adjudged a bankrupt, it would have fallen under the condemnation contained in the thirty-fifth section of the bankrupt law. But, unless fraudulent upon other grounds than because it was made for that purpose and with that intent, the assignee cannot impeach it or recover. This subject has been discussed in Collins v. Gray [Case No. 3,013].

(2) In respect to the alleged inadequacy of price, the testimony is greatly conflicting. But the opinions expressed by Bridenbacker and James D. Ferguson, as witnesses, is impeached by their own account of the transaction. If the farm was, in fact, deemed of greater value, at the time, than the price Charles agreed to pay, there was no motive for the undervaluation. It would have been easy, and according to what they say was understood should be done, to have Charles give notes for the full amount due to them, or for which they were liable, and so carry into effect what they say was actually agreed, and, at the same time, avoid the appearance of evil. Besides, they stood by, assenting to the transaction, without a suggestion that the price was not full value of the farm, subject to the inchoate right of dower, or that the personal property was worth more than the appraisal then made,

and, in part at least, made by Bridenbacker himself.

Again, more than twenty apparently disinterested witnesses testify to its value, whose estimate shows that $7,000. subject to that right of dower, was all or more than the farm was worth; and, an estimate founded on the value of that right of dower, if Amos S. Ferguson had then died, and treating the annual value as equal to the legal interest, will show that, allowing $7,000 for the farm was, according to modern approved annuity tables, equivalent to an aggregate valuation of the farm at over $9,400. No one of these witnesses estimates the value as greater, subject to the right of dower, than Charles agreed to pay.

Bridenbacker and James D. Ferguson, as witnesses herein, and eleven witnesses whom they have produced, and who swear almost in their words, estimate the gross value of the farm at twelve thousand dollars, a price plainly speculative, and based upon a supposed practicability of selling the land, or parts of it, for building lots, without showing that there is any demand for such building lots at that distance from the city of Utica, and notwithstanding there are very many farms nearer to the city, recently sold at much less prices than even the estimates of the defendants' witnesses. If it were conceded that the industry and zeal of Bridenbacker and Ferguson had succeeded in finding persons who will say that the land is worth more than was paid for it, or that they would give more, this is by no means conclusive. This is no uncommon state of things. What is more frequent, after a sale of valuable property, than the finding of some prepared to say they would have given more? Looking at the circumstances already alluded to, and the very large contradiction of those who give the larger estimates, I am constrained to say, that there was no such inadequacy of price as warrants the inference of fraud in the sale.

(3) As to the continued residence of Amos S. Ferguson with his son. The proof satisfactorily shows he was an invalid, and that Charles did, in fact, take charge of the farm and direct its cultivation, hiring and paying the laborers, and providing for the support of the family, aided, no doubt, by such assistance as his father was able to render, and, to some small degree, by contributions of his sister, from her earnings. This is in perfect consistency with good faith and honesty in the transaction, and, coupled with the positive testimony of both Charles and his father, to the absence of any fraudulent design, the relations of the son to such a father, and the son's obvious need of his mother's assistance, at least, in keeping the house, repels any presumption or inference arising from the father's continued residence and occasional assistance on the farm. I am disposed to judge much more favorably of the reasonable, just and fair intent of the defendant Charles, from what he did in this respect, than I should be if he had turned his father and mother out of the house.

My conclusion hereupon is, that the bill of complaint should be dismissed, with costs.